**STATE of Missouri, Respondent,**

v.

**James Winston HARRIS, Appellant.**

**No. 52082.**

Supreme Court of Missouri,

Division No. 1.

March 13, 1967.

Motion for Rehearing or for Transfer to
Court En Banc Denied April 10, 1967.

────◆────

Norman H. Anderson, Atty. Gen., Jefferson City, David G. Dempsey, Sp. Asst. Atty. Gen., Clayton, for respondent.

Gerald D. Moris, St. Louis, for appellant.

HOLMAN, Presiding Judge.

The indictment in this case charged defendant with the offense of murder in the first degree. The jury found him guilty of murder in the second degree. Since it was alleged and proved that he had been convicted of two prior felonies, and imprisoned thereon, the court determined his punishment which was fixed at imprisonment for a period of twenty years. See §§ 559.010, 559.020, 559.030, and 556.280, RSMo 1959, V.A.M.S. Defendant has appealed.

The evidence on the part of the State tended to show that Bobby Davie, Billie Guthrie, Alfred Williams, and Bobby Crawford all gathered at the Crawford home in St. Louis, Missouri, shortly after midnight on the early morning of February 27, 1965, where they drank a quantity of whiskey and beer. They later walked to a nearby restaurant where they visited and drank coffee for a time, and then proceeded to Irene's Coffee Shop at 1705 Franklin, arriving at about 4 a. m. Although the coffee shop was crowded, with some 30 or 40 people, they obtained a table and some of them ordered more coffee. Shortly after they arrived Crawford went to the toilet located in the rear of the building and Alfred (hereinafter referred to as deceased) went to the front of the shop and sat down in a chair by the vending machine. Shortly thereafter deceased was shot in the left temple with a gun in the possession of defendant, and this wound admittedly caused his death which apparently occurred immediately.

Irene Wiley testified that she saw defendant when he entered her coffee shop about five minutes before the shooting and that she "didn't like the expression on his face"; that defendant then walked over by the vending machine where deceased was sitting and took a gun out of his belt and shot deceased; that he then put the gun back in his belt and left by the front door; that deceased had nothing in his hands, was seated, and was not making any motions of any kind.

Bobby Davie testified that he had known defendant for two or three months and that he and deceased had roomed together for several months prior to the shooting; that after they arrived at Irene's on this occasion defendant came in and grabbed his coat and asked him why he hadn't called, and the witness replied, in effect, that he had called but that defendant was not home; that at about that time deceased came back to their table and obtained a cigarette and then went back to the front and sat down by the vending machine; that shortly thereafter he heard a shot, and when he looked up he saw defendant with a gun in his hand, moving it back toward his belt, and that defendant then turned and walked out the door; that deceased slumped down in his chair and, at Irene's request, his body was removed from the restaurant and placed on the sidewalk in front; that he saw no knife or other weapon in deceased's hands and there was nothing of that kind around the chair where deceased had been seated.

Shortly after the shooting defendant went to the home of Peggy Damous where he left the gun. A little later he and Peggy

went to the home of his sister. At about noon defendant had a neighbor of his sister call off-duty policeman Nowland Brown. Brown talked with defendant on the phone before going to the residence of defendant's sister where he placed defendant under arrest. Brown then took defendant and Peggy to Peggy's home where Peggy gave the gun to defendant and defendant gave it to Brown.

Defendant was the only witness offered by the defense. He testified that he was in Irene's Coffee Shop from 2:30 a. m. until about 4 a. m. on February 27, 1965; that he saw deceased and his three companions enter the coffee shop shortly before 4 o'clock. He stated that he had a conversation with the deceased about a girl, at which time deceased grabbed him by the coat and pulled out a knife; that deceased released him but that a few minutes later he had another conversation with deceased in which the subject was money; that deceased then grabbed him with his left hand and pulled him off the chair on which he was sitting and then pulled the knife out of his pocket with his right hand, at which time he, the defendant, pulled a pistol out of his waistband with his right hand; that deceased hit the pistol and it discharged. He denied that he intentionally shot deceased. Defendant further testified that "the fellows pushed me out the door" and he took a cab and went to Peggy's house; that he and Peggy then went to his sister's home and, later that day, used the telephone next door and called the police. On cross-examination defendant stated that he had won this gun in a crap game earlier that morning and that he didn't know it was loaded.

The court gave instructions submitting murder in the first degree, second degree, and manslaughter. Instructions were also given submitting the defenses of self-defense and accidental shooting.

The first point briefed relates to the testimony of Joseph Harr who was offered as a rebuttal witness by the State. Harr, a detective in the police department, testified that he questioned defendant after his arrest. He stated that the defendant talked with him about the occurrence in the coffee shop but the witness did not purport to relate the conversation. In an effort to rebut defendant's testimony the State elicited testimony from this witness that when he asked defendant what happened defendant did not tell him that deceased touched him, or had a knife, or that the gun went off when deceased grabbed him and hit his arm. He stated that in obtaining certain information from defendant no force was used and no threats or promises were made. He was not asked whether he told defendant of his right to counsel or to remain silent.

Defendant contends that he should be granted a new trial because he has been deprived of his rights under the Fifth and Sixth Amendments to the United States Constitution. He concedes that he made no appropriate objection to the testimony, that it was not mentioned in his motion for new trial, and hence that the point was not preserved for appellate review. It is asserted, however, that a miscarriage of justice resulted from the admission of that evidence and that we should review the contention under the "plain error" rule. See S.Ct. Rule 27.20(c), V.A.M.R.

We see no reason for reviewing this contention under the plain error rule. This case was tried prior to the decision in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and that case would not afford defendant any relief. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. Also, we do not see that there was any violation of the holding in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. See State v. Beasley, Mo.Sup., 404 S.W.2d 689. Moreover, we are mindful that there was no proof of a "confession" in the usual sense. Here, in an effort to discredit defendant's testimony, there was a showing that certain

facts he related in his testimony were not stated to the police officer when he talked with him about the occurrence. Under the circumstances stated we do not deem it appropriate to consider this point under Rule 27.20(c).

The second point briefed is that the trial court abused its discretion and therefore committed prejudicial error in refusing to grant defendant a new trial because of newly discovered evidence. In support of that assignment there was attached to the motion for new trial an affidavit by defendant's attorney wherein he stated that "immediately upon conclusion of the trial of this case, it was brought to the attention of your affiant by Mr. Melvern F. Reinhardt, one of the jurors who tried this case, that State's Exhibit No. 1, alleged to be the gun which caused the death of Alfred Williams, was not in proper operating condition in that the gun would not 'cock', that is, be set in a firing position by pulling back the hammer, and the trigger was extremely hard to pull. Thereafter, your affiant consulted with a person who is expert in firearms and was informed that if the hammer mechanism on a revolver of practically any type is broken or worn so that the full pressure of the hammer rests directly on the firing pin it is very likely that a sudden blow or bump would cause the gun to discharge without the trigger being pulled or the hammer being pulled back and released. * * * that it was never brought out in trial that defendant would have said he did not pull the trigger and your affiant states that he did not learn of the worn or broken condition of Exhibit No. 1 until after the trial. * * * that the above described evidence goes to the essence of the questions of intent and accident presented in this case."

The requirements for securing a new trial because of newly discovered evidence are "(1) that the evidence has come to the knowledge of the defendant since the trial, and (2) that it was not owing to his want of due diligence that he did not discover it sooner, and (3) that the evidence is so material that it would probably produce a different result on a new trial, and (4) that it is not cumulative only or merely impeaching the credit of the witness." State v. Stroud, 362 Mo. 124, 240 S.W.2d 111, 113. In this case it would have been relatively easy to have obtained possession of the gun prior to the end of the trial and, by examination, to have determined its "operating condition." Also, defendant's attorney could have determined at any time what defendant would have said about whether he pulled the trigger by merely asking him. It therefore appears that there was a lack of diligence in failing to discover this evidence prior to or during the trial. Moreover, the effect of defendant's testimony was that the gun was accidentally, rather than intentionally, discharged and hence the newly discovered evidence would not likely have produced a different result. We are convinced that the trial court did not abuse its discretion in refusing to grant a new trial upon this assignment.

During the examination of Irene Wiley the following occurred: "Q What did he have in his hand? A Apparently it was the murder weapon." Defendant immediately objected and the court sustained the objection and directed the jury to disregard the answer. Defendant then moved for a mistrial which was denied. After that ruling the court again instructed the jury to disregard the answer. It is here contended that the use of the word "murder" in the answer was so prejudicial that the court abused its discretion in failing to declare a mistrial. We do not agree. It seems apparent to us that the word "murder" was used simply as a descriptive term in order to indicate that the gun was the one used in the homicide. Certainly, a reasonably intelligent jury would not consider that Mrs. Wiley was attempting to pass on all of the legal and factual elements to be considered in determining whether or not the killing constituted mur-

der. Also, it must not be overlooked that the court twice told the jury to disregard the answer and we may reasonably assume that the jury did so. We see nothing to indicate that the trial court abused its discretion in denying the motion for a mistrial. State v. Camper, Mo.Sup., 391 S.W. 2d 926.

Near the end of the closing argument of the assistant circuit attorney the following occurred: "Mr. Fredericks: * * * if this man is guilty your verdict should be such that it is a deterrent to others, a deterrent to others to carry a gun, a deterrent to others to bring a gun into a crowded place, a deterrent to shoot another man in his head— Mr. Morris: I object; carrying a gun, that is not in this case. The Court: I strike out, and the jury will disregard, the reference to the carrying of the gun." The effect of the court's ruling was to sustain the objection and to instruct the jury to disregard the portion of the argument objected to. Defendant concedes that he received all the relief requested, but in his motion for new trial he contended that the argument was so prejudicial that the court should have granted a new trial under the plain error rule. He here contends that we should review the argument under the plain error rule and grant a new trial by reason thereof.

While we doubt that the reference to carrying a gun was improper, it will be noted that the jury was instructed to disregard that portion of the argument and we consider that action sufficient to eliminate any possible prejudice that might otherwise have occurred. The principal contention advanced here is that it was prejudicial for the assistant circuit attorney to argue that the verdict should be such that it would be a deterrent to others when, as in this case, the jury would only determine guilt or innocence and would not fix the punishment. We see no merit in that contention. It is not improper to argue that guilty persons should be convicted in order that others be deterred from the commission of crime. The fixing of punishment is secondary; but a finding of guilt is basic and fundamental to any argument that the verdict should be such as to deter others from the commission of crime. The trial court denied the contention under consideration in overruling the motion for new trial. We are convinced that the court did not abuse its discretion in so ruling. As indicated, this point is disallowed.

An examination of the record as required by S.Ct. Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

All concur.